UNITED STATES DISTRICT COURT
DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

    Plaintiff,

vs.                                                                                                             No. 18-CR-00928 MV

ROBERT HAACK,

    Defendant.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** is before the Court on Robert Haack's Motion to Suppress Evidence Seized as a Result of an Unlawful Search [Doc. 45]. The government filed a response in opposition on March 23, 2020 [Doc. 49]. Mr. Haack filed a reply on April 16, 2020 [Doc. 52]. The government and Mr. Haack each filed supplemental briefing on May 20, 2024 [Docs. 118, 119]. On May 24, 2024, this Court held an evidentiary hearing on Mr. Haack's motion, where it heard testimony from Special Agent Zachary Oper and Zenia Orbe. Having carefully considered the briefs, exhibits, testimony, and relevant law, and being otherwise fully informed, the Court finds that the Motion is not well-taken and will be denied.

## BACKGROUND

Mr. Haack is charged with two counts of wire fraud, in violation of 18 U.S.C. §1343, two counts of mail fraud, in violation of 18 U.S.C. 1341, two counts of aggravated identity theft, in violation of 18 U.S.C. § 1028A(a)(1), and two counts of violating the Indian Arts and Crafts Act, in violation of 18 U.S.C. § 1158. Doc. 26. At issue in this opinion is whether the evidence seized from the second floor of Mr. Haack's residence on December 13, 2017 is admissible at trial. The following represents the Court's findings of fact, based on the evidence submitted by the parties

1

and the testimony presented at the May 24, 2024 hearing.[1]

In 2012, the U.S. Fish and Wildlife Service (USFW) launched an investigation into the sale of purportedly counterfeit Charles Loloma jewelry. Doc. 45 at 1. The late Charles Loloma was a world-renowned jeweler and one of the most significant Native American artists of the twentieth century. Doc. 49 at 2; Doc. 45-1 at 14. His jewelry is highly collectible and typically sells for tens of thousands of dollars. Doc. 49 at 2; Doc. 45-1 at 14.

Based on complaints from within the jewelry community, USFW came to suspect that jewelry sold under the eBay username "Harvardantique" was counterfeit. Doc. 49 at 2. When USFW determined that Mr. Haack operated the "Harvardantique" account, he became the subject of its criminal investigation. *Id.* On April 9, 2013, a USFW agent purchased a "Loloma" ring from Mr. Haack for $4,300. *Id.*; Doc. 45-1 at 15. On June 16, 2014, a USFW agent purchased a "Loloma" bracelet from Mr. Haack for $15,098. Doc. 49 at 2; Doc. 45-1 at 18. Forensic examiners, as well as Mr. Loloma's niece, examined the pieces and deemed them to be inauthentic. Doc. 49 at 1-2.

According to subpoenaed bank records, Mr. Haack sold approximately 41 pieces of purported Loloma jewelry on eBay from 2008 through 2015 for approximately $439,810.95. Doc. 45-1 at 19. After a customer complaint on eBay in 2015, Mr. Haack began selling purported Loloma jewelry directly to customers like "D.H.," who paid approximately $60,694 for purported

---

[1] When ruling on a motion to suppress, the Court must state its essential findings on the record. Fed. R. Crim. P. 12(d). This Memorandum Opinion and Order's findings of fact shall serve as the Court's essential findings for Rule 12(d) purposes. The Court makes these findings under the authority of Rule 104(a) of the Federal Rules of Evidence, which requires a judge to decide preliminary questions relating to the admissibility of evidence. *See United States v. Merritt,* 695 F.2d 1263, 1269–70 (10th Cir. 1982) ("[U]nder Rule[] 104(a) . . . , the district court 'is not bound by the Rules of Evidence except those with respect to privilege.'") (quoting *United States v. Matlock,* 415 U.S. 164, 174 (1974)). In deciding such preliminary questions, the other rules of evidence, except those with respect to privilege, do not bind the Court. Fed. R. Evid. 104(a).

Loloma jewelry between 2015 and 2017. *Id.* at 23. When questioned, Mr. Loloma's former business manager dismissed the possibility that Mr. Haack could have acquired such a significant collection of Loloma pieces. *Id.* at 16-17. USFW agents also obtained bank records showing that Mr. Haack had made significant purchases of raw materials consistent with jewelry making between 2008 and 2017. *Id.* at 25-27.

Based on this information, Special Agent Zachary J. Oper ("SA Oper") applied for a search warrant to search Mr. Haack's residence on December 7, 2017. Doc. 45-1 [First Search Warrant Application]. SA Oper personally observed the residence and pulled financial and property records for the residence. Doc. 49 at 3. SA Oper reviewed a residential appraisal that indicated that the house was a two-unit building. *Id.* at 4; Doc. 49-3 [Appraisal]. Upon reviewing a floorplan with no discernible internal stairway, SA Oper concluded that Mr. Haack's residence was confined to the first-floor unit of the two-story duplex. Doc. 49 at 4. Accordingly, SA Oper described the residence in relevant part as follows: "The RESIDENCE is the first floor unit of a two-unit, two-story property." *Id.* at 3. The Central District of California granted the search warrant at 2:25 PM on December 7, 2017. Doc. 45-2 at 2 [First Search Warrant]. The search warrant contained an identical description of Mr. Haack's residence. *Id.* at 4.

Around 6:30 a.m. on December 13, 2017, USFW agents executed the search warrant on Mr. Haack's home. Doc. 45 at 3; Doc 49-2; Transcript of May 24, 2024 Hearing ("Hr'g. Tr.") 18:24-19:3.[2] The team executing the search warrant consisted of nine agents. Hr'g. Tr. 53:18-20. Six of the agents were based in New Mexico, two were based in Arizona, and one was based in Texas. Hr'g. Tr. 56:2-11. In order to enter the premises, agents cut a chain securing a gate across

---

[2] The Court's citations to the transcript refer to the court reporter's original, unedited version; any final transcripts may contain slightly different page and/or line numbers.

3

the driveway and proceeded down the driveway and around the corner, to the back of Mr. Haack's residence. Hr'g. Tr. 19:23-20:4. SA Oper knocked on the door at the back of the residence, later identified as the basement door, and announced the presence of police with a search warrant. Hr'g. Tr. 22:5-22. He continued to knock and announce for "thirty minutes, approximately." Hr'g. Tr. 22:15-16. Eventually, SA Oper made the decision to breach the door. Hr'g. Tr. 24:16-19. After breaching and entering the basement door, SA Oper quickly realized that this was not the first floor of the residence described in the plans on which he based his search warrant application. Hr'g. Tr. 25:19-26:7. Upon realizing that the space they had entered was, in fact, a basement and not the first floor, SA Oper and his team exited and proceeded up an outdoor set of stairs to a door that faced into the kitchen of what the search warrant described as the first floor of the residence. Hr'g. Tr. 26:10-27:8. Again, SA Oper knocked and announced the presence of police with a search warrant and breached the door to the first floor kitchen. Hr'g. Tr. 27:13-21.

Upon entry, it became apparent to USFW agents that there was an internal staircase leading to the second floor, which had not been reflected on the floor plans. Doc. 45 at 4; Doc. 49 at 5. One agent discovered Mr. Haack descending the stairs. Hr'g. Tr. 29:17-24. Agents performed a "protective sweep" of the second floor and discovered Mr. Haack's partner, Zenia Orbe, and their two children. *Id.* at 30:21-31:13. At that point, SA Oper was made aware that there was evidence relevant to the investigation in plain sight on the second floor. *Id.* at 32:3-18. Mistakenly believing that this discovery permitted agents to proceed with a more extensive search, SA Oper directed his team to begin searching the second floor and collecting evidence. *Id.* at 34:15-25.

Later in the morning, roughly between 10:00 a.m. and 11:00 a.m., at the advice of an Assistant United States Attorney ("AUSA") based in California, SA Oper instructed his team to pause the search while he drafted a second search warrant application that included the second

floor of the residence and awaited approval from a local magistrate judge. Hr'g. Tr. 37:1-4, 37:14-19. At the hearing, he acknowledged that, by the time he paused the search and sought a warrant, his team was at the "middle to end" of the search of the second floor. *Id.* at 37:10-13. After speaking with the AUSA, SA Oper left the property to secure a new warrant. *Id.* at 37:24-38:1. He left in his truck, which at the time had no evidence from Mr. Haack's home inside of it. *Id.*

According to SA Oper's request for a second warrant, Mr. Haack's "children were on the second floor of the RESIDENCE, which USFW[] agents entered to conduct a safety search because the second floor and the first floor of the RESIDENCE are connected." Doc. 49-7 at 13 [Second Search Warrant Application]. Once the safety search was completed, USFW agents "began searching the second floor, including digital devices found on the second floor, but stopped the search immediately after realizing that the second floor was not included in the December 7, 2017 search warrant." *Id.* at 14. The statement of probable cause in the second warrant application did not rely on anything that agents found during their search of the second floor. Hr'g. Tr. 42:21-23. Notably, this description omits the fact that SA Oper stopped the search only upon advice of an Assistant United States Attorney. *Id.* at 76:6-21. Furthermore, it is clear that some agents did not in fact follow this order and continued to search and catalog evidence on the second floor in the hours that elapsed between when SA Oper gave instructions to stop searching and when he secured the second warrant. Hr'g. Tr. 76:22-25.

At 3:40 PM, the Central District of California granted a second search warrant to search Mr. Haack's residence. Doc. 45-3 at 2 [Second Search Warrant]. The second search warrant authorized USFW agents to search "the basement and first and second floor of the duplex." *Id.* at 4. In the application for the second search warrant, SA Oper noted that agents had already begun to search the second floor. Hr'g. Tr. 42:24-43:7.

5

At 3:42 PM, SA Oper sent a text to USFW agents stating: "Good to search." Doc. 49-5 at 2. At this point, USFW agents completed their search and, once SA Oper returned to the scene shortly after 4:00 p.m., began loading SA Oper's vehicle with seized evidence. Doc. 49 at 6; Hr'g. Tr. 72:15-73:4. SA Oper testified that no evidence was removed from Mr. Haack's property until the second search warrant was obtained and he returned in his truck, where the evidence was then loaded. Hr'g. Tr. 39:24-40:21. All evidence that had been seized was loaded into SA Oper's vehicle which he then drove back to New Mexico. *Id.* at 44:25-45:7, 46:22-47:1. USFW agents seized various items including half-finished jewelry etched with the characteristic Loloma signature, engraving tools, bookmarked Loloma reference material, and jewelry-design sketches. Doc. 49 at 5.

## DISCUSSION

Mr. Haack's Motion to Suppress raises two major questions: (1) what law controls the analysis of the instant case, and (2) whether there are any valid exceptions to the exclusionary rule with respect to the evidence seized from the second floor of Mr. Haack's residence. For the reasons explained below, the Court finds that Ninth Circuit precedent controls and that the independent source exception to the exclusionary rule applies to the evidence seized from the second floor of Mr. Haack's residence.

I. **Ninth Circuit law controls this motion.**

Mr. Haack urges this Court to apply the law of the Ninth Circuit, where the search and seizure occurred. Doc. 45 at 5. While "[a] district court must follow the precedent of this circuit, regardless of its views concerning the advantages of the precedent of our sister circuits," *United States v. Spedalieri*, 910 F.2d 707, 709 n.2 (10th Cir. 1990), numerous district courts have held that the propriety of law enforcement's conduct should be determined by the law of the circuit in

6

which their conduct occurred. *See, e.g.*, *United States v. Warras*, No. 2:13-cr-439, 2015 WL 6736981 (D. Nev. May 18, 2015), *report and recommendation adopted*, 2015 WL 6755275 (D. Nev. Nov. 4, 2015); *United States v. Kennedy*, No. CRIM. 13-240, 2014 WL 6090409, at *5 (W.D. Pa. Nov. 13, 2014), *aff'd*, 720 F. App'x 104 (3 Cir. 2017); *United States v. Barragan*, 589 F. Supp. 2d 1012, 1015–16 (S.D. Ind. 2008); *United States v. Ozuna*, 129 F. Supp. 2d 1345, 1354 (S.D. Fla. 2001), *aff'd*, 48 F. App'x 739 (11th Cir. 2002); *United States v. Longo*, 70 F. Supp. 2d 225, 261 (W.D.N.Y. 1999); *United States v. Restrepo*, 890 F. Supp. 180, 191 (E.D.N.Y. 1995); *United States v. Gerena*, 667 F. Supp. 911, 914–24 (D. Conn. 1987). This approach, known as the *lex loci* approach, is based on the premise that "officers should be able to rely on their understanding of the law as their circuit has interpreted it." *United States v. Maley*, Cr. No. 13-3696, 2020 WL 1041545, at *6 (D.N.M. Mar. 3, 2020), *aff'd*, 1 F.4th 816 (10th Cir. 2021). Officers "could not have been expected to know the law in circuits other than the one in which they were operating." *Restrepo*, 890 F. Supp. at 191. Consequently, to effectuate the exclusionary rule's primary purpose of deterring police misconduct, "logic requires that [officers'] conduct be consistently held to the law as applied within their own circuits." *Kennedy*, 2014 WL 6090409, at *5.

While the government argues that there is no choice-of-law issue because "there are not two sovereign bodies of law to consider," but only a single body of federal law, the cases to which the government cites explicitly acknowledge "the reality of conflict among the circuits on the proper interpretation of federal law." Doc. 49 at 9; *In re Korean Air Lines Disaster of Sept. 1, 1983*, 829 F.2d 1171, 1174 (D.C. Cir. 1987), *aff'd sub nom. Chan v. Korean Air Lines, Ltd.*, 490 U.S. 122 (1989). Moreover, the cases on which the government relies do not concern the exclusionary rule. *See In re Korean Air Lines Disaster*, 829 F.2d 1171 (concerning per passenger

damages limitations in wrongful death actions); *Meeks v. Illinois Central Gulf R.R.*, 738 F.2d 748, 751 (6th Cir. 1984) (concerning formal notice requirements of the Railway Labor Act).

The government's argument that to employ the *lex loci* approach would be to "ignore the Tenth Circuit" is also unpersuasive. Doc. 49 at 8. The government cites to *Gates*, where the First Circuit explicitly rejected the district court's use of the *lex loci* approach, finding that "the legitimacy of a *Terry* stop is a matter of federal constitutional law." *United States v. Gates*, 709 F.3d 58 (1st Cir. 2013). Yet in the Tenth Circuit, the case law holds otherwise. In *Maley*, the Tenth Circuit affirmed a case that explicitly contemplated applying Ninth Circuit law to a suppression motion, thereby signaling the availability of the *lex loci* approach to resolve cases like this one. 1 F.4th 816, 821 (10th Cir. 2021). Ultimately, the Tenth Circuit declined to rule on the *lex loci* approach because the government did not oppose it, and because even under the Ninth Circuit standard, there was no constitutional violation. *Id.*

The district court in *Maley* weighed the following factors when considering whether to apply Ninth or Tenth Circuit law on the motion to suppress: (1) where the officers' challenged conduct occurred; (2) where the officers were employed; (3) where the warrant was issued; and (4) where the criminal investigation leading to the warrant's issuance occurred. 2020 WL 1041545, at *6. Although the "challenged conduct occurred in Arizona, which would seem to indicate that the Court should apply Ninth Circuit law," the other three factors linked back to New Mexico. *Id.* "These circumstances make it more difficult to ascertain which law should apply. Arguably, New Mexico officers trying to execute a New Mexico warrant arising out of a New Mexico investigation should have been able to rely on their understanding of the law as the Tenth Circuit interpreted it." *Id.*

8

Regarding Mr. Haack's motion, the *Maley* factors weigh in favor of a finding that Ninth Circuit law controls. First, and most persuasively, the challenged search and seizure of evidence occurred in California. Second, while SA Oper and several other agents were based in New Mexico, other agents executing the search warrants were based out of Arizona and Texas, the Ninth and Fifth Circuits respectively. Third, both search warrants were issued by a magistrate judge in California. Finally, the investigation took place in both California and New Mexico. For example, although SA Oper was based in New Mexico, he flew to California to surveil Mr. Haack and his residence prior to obtaining the first search warrant. Doc. 45-1 at 27-28. Other USFW agents traveled to Oregon to conduct a forensic examination of examine a ring and bracelet. *Id.* at 19. Moreover, most of the events investigated took place in California. *Id.* at 3-28. Hence, the weight of the *Maley* factors support a finding that Ninth Circuit law controls.

However, as discussed below, the Court notes that both Ninth and Tenth Circuit law support the application of the independent source exception to the exclusionary rule and, in the instant case, "nothing turns on [the] answer" to the question of which law applies. *United States v. Denson*, 775 F.3d 1214, 1217 (10th Cir. 2014). Thus, while the Court analyzes the instant case under Ninth Circuit law, as the Court ultimately finds that the application of the independent source exception would be equally inevitable under Tenth Circuit precedent, this finding does not risk violating the principle of vertical stare decisis.

**II.     Under Ninth Circuit law, the independent source exception to the exclusionary rule applies to the evidence in question.**

The Fourth Amendment requires that a warrant "particularly describ[e] the place to be searched." U.S. Const. amend. IV. "Suppression is generally the proper remedy when the police go beyond the scope of an authorized search warrant by searching places . . . not included in the

warrant." *United States v. Hurd*, 499 F.3d 963, 966 (9th Cir. 2007). However, certain exceptions to the exclusionary rule can apply.

"[T]he independent source doctrine allows trial courts to admit evidence obtained in an unlawful search if officers independently acquired it from a separate, independent source." *Utah v. Strieff*, 136 S. Ct. 2056, 2061 (2016). "Under that doctrine, suppression is unwarranted, even where evidence was 'initially discovered during, or as a consequence of, an unlawful search,' when that evidence is 'later obtained independently, from activities untainted by the initial illegality.'" *United States v. Saelee*, 51 F.4th 327, 335 (9th Cir. 2022) (quoting *Murray v. United States,* 487 U.S. 533, 537 (1988)). "This exception ensures that the police will be placed 'in the same, not a *worse*, position that they would have been in if no policy error or misconduct had occurred." *Saelee*, 51 F.4th at 335 (quoting *Murray*, 487 U.S. at 537) (emphasis in original). "To establish that evidence initially acquired unlawfully has later been independently obtained through an untainted source, the Government must show that no information gained from the Fourth Amendment violations affected either [1] the law enforcement officers' decision to seek a warrant or [2] the magistrate's decision to grant it." *Saelee*, 51 F.4th at 335 (citing *Murray*, 487 U.S. at 539-40); *see also Segura v. United States*, 468 U.S. 796, 815 (1984) ("[E]vidence will not be excluded as 'fruit' unless the illegality is at least the 'but for' cause of the discovery of the evidence." (quotation omitted)).

In *Saelee*, the Ninth Circuit applied this standard to find that the independent source doctrine applied, even though "before obtaining a warrant, [agents] entered the apartment and conducted an extensive search, which well exceeded the scope of a protective sweep or a permissible securing of the premises, and seized the delivered packages, Saelee's cell phone and wallet, and the ammunition in his bedroom." 51 F.4th at 335. The Court noted, however, that it

was "undisputed that, prior to the issuance of the warrant, nothing was removed from the premises and the contents of Saelee's cell phone were not examined." *Id.* With regard to the law enforcement officers' decision to seek a warrant, the Court found that the agent had already prepared a near-complete warrant application, save for the addition of a single paragraph to be inserted after a controlled delivery of a package had been completed, and that the agent dictated that final paragraph very shortly after the initial entry into Saelee's apartment and prior to much of the search activities that the agents documented in photographs. "Given that the application was nearly complete before an unlawful conduct occurred, and was completed within minutes of the allegedly illegal arrest and entry," the Court held that the district court "did not clearly err in concluding that the agents' decision to seek the warrant was unaffected by any of the Fourth Amendment violations that Saelee allege[d]." *Id.* at 336. Next, with regard to the magistrate's decision to grant the warrant, the Court noted that "[t]he only 'facts' included in the warrant application that were learned as a result of the alleged violations were that Saelee had been arrested and that the premises had been secured." *Id.* The Court found that this "information adds nothing, logically or legally, to whether there was probable cause to search the premises." *Id.* The Court thus concluded that it was "clear" that this information "did not influence the magistrate judge's decision to issue the warrant." *Id.*

Having found that the two requirements of the independent source doctrine were met, the Court went on to address Saelee's argument that the doctrine could not be applied, because "the evidence here had already been seized before the warrant was issued," and thus that it "remained continuously in the . . . agents' custody." *Id.* Saelee reasoned that there was just "one seizure and any purported subsequent 'seizure' pursuant to the warrant was illusory and not *factually* independent." *Id.* The Court rejected this contention as inconsistent with Supreme Court precedent,

11

namely, *Murray*. The *Saelee* Court explained that, under *Murray*, both tangible and "intangible evidence 'already discovered' as a result of an unlawful search can be said to be independently 'rediscovered' if 'that later acquisition was not the result' of the unlawful conduct," and "an independently sought-and-issued warrant authorizes their seizure at that location." *Id.* (quoting *Murray*, 487 U.S. at 541-42). Further, "the independent source doctrine does not require that the officers return the objects to private control before reseizing them pursuant to the warrant." *Id.* The Court noted, however, that "continuous police custody of the objects may make it hard for the police to persuasively make the necessary factual showing that their decision to seek a warrant for the search and seizure of the objects was not affected by the unlawful conduct." *Id.* But the *Saelee* Court concluded that in the case before it, "the officers amply made that showing." *Id.* Accordingly, the Court held that the district court had "correctly denied Saelee's motion to suppress, as "all of the tangible and intangible evidence obtained as a result of the alleged Fourth Amendment violations was independently rediscovered or reseized when the agents executed a search warrant that was both sought and issued independently of any such violations." *Id.* at 338.

Additional cases from the Ninth Circuit further illustrate the proper application of the independent source exception. In *United States v. Aloba*, the Ninth Circuit held that even when an initial seizure was conducted according to unconstitutionally overbroad state warrants, subsequent federal warrants provided an independent source for the evidence "because they were supported by probable cause and did not rely on any of the information obtained from the state warrants." No. 19-50343, 2022 WL 808208, at *1 (9th Cir. March 16, 2023). Furthermore, "[t]he fact that the federal warrant sought evidence in the state's possession does not alter this inquiry." *Id.* The Ninth Circuit found in *United States v. Winn* that a federal warrant was a "genuinely independent source" of evidence that was initially downloaded from a cell phone without a warrant. 811 F. App'x 1011,

1015 (9th Cir. 2020). The court in *Winn* held that the independent source exception applied because the federal officers' affidavit seeking the warrant "contained no 'tainted evidence' derived" from that search and because "federal officers would have sought the warrant regardless of the [initial search] based on the [other available] evidence." *Id.* (citations omitted).

Ninth Circuit law supports the application of the independent source exception with respect to the evidence in question. The government does not dispute that the initial discovery and seizure of the evidence in question was a Fourth Amendment violation. Hr'g Tr. at 154:7-9. However, the independent source exception "ensures that the police will be placed 'in the same, not a *worse*, position that they would have been in if no policy error or misconduct had occurred." *Saelee*, 51 F.4th at 335 (quoting *Murray*, 487 U.S. at 537) (emphasis in original). In the instant case, suppressing the evidence in question would place the government in a worse position than if agents had desisted searching immediately following the protective sweep of the second floor and awaited the second warrant before continuing to search and seize evidence. Applying the independent source exception simply puts the government in the position it "would have been in if no policy error or misconduct had occurred," rather than granting any strategic advantage derived through the violation of Mr. Haack's rights. *Id.* In this case, agents' premature seizure of the evidence in question was cured by Special Agent Oper's seeking and securing a second search warrant that did not rely on any new evidence from the illegal search. Hr'g Tr. at 42:21-23.

Furthermore, the government has met its burden to show that the Fourth Amendment violation did not affect "law enforcement officers' decision to seek a warrant" or "the magistrate's decision to grant it." *Saelee*, 51 F.4th at 335 (citing *Murray*, 487 U.S. at 539-40). First, the Fourth Amendment violation had no bearing on Agent Oper's decision to seek a second warrant, as it was always SA Oper's intention to search the entirety of Mr. Haack's residence for evidence of a

13

jewelry forgery operation. Hr'g. Tr. 13:19-23. The application for the initial search warrant makes clear that it was intended to describe the entirety of the portion of the house that Mr. Haack occupied. Doc. 45-1 at 3. Second, as the second search warrant application "contained no 'tainted evidence' derived" from the illegal search or seizure of evidence on the second floor, the Fourth Amendment violation did not influence the magistrate judge's decision to grant the second warrant. *Winn*, 811 F. App'x at 1015; Doc. 49-7; Hr'g. Tr. 42:21-23. The second warrant was therefore a valid independent source of the evidence seized, as the Fourth Amendment violation did not affect "the agents' decision to seek the warrant" and "did not influence the magistrate judge's decision to issue the warrant." *Saelee*, 51 F.4th at 336.

*Saelee* makes clear that the fact that the evidence had already been seized and was continuously in the government's possession following the illegal seizure does not preclude the application of the independent source exception. *Saelee*, 51 F.4th at 336 (quoting *Murray*, 487 U.S. at 541) ("The independent source doctrine does not require that the officers 'return[] the objects to private control' before reseizing them pursuant to the warrant"). *See also United States v. Aloba*, No. 19-50343, 2022 WL 808208, at *1 (9th Cir. March 16, 2023) ("The fact that the federal warrant sought evidence in the state's possession does not alter [the independent source] inquiry."). As established above, the government has met its burden in the instant case to make the "necessary factual showing that their decision to seek a warrant for the search and seizure of the objects was not affected by the unlawful conduct." *Saelee*, 51 F.4th at 336.[3]

---

[3] The Court notes that the law of the Tenth Circuit mandates the same conclusion. Where a source independent of any constitutional violation supports the seizure of challenged evidence, that evidence is not subject to suppression, "notwithstanding any antecedent Fourth . . . Amendment violation." *United States v. Forbes*, 528 F.3d 1273, 1278 (10th Cir. 2008) (citing *Nix*, 469 U.S. at 443; *Murray*, 487 U.S. at 537). Like the Ninth Circuit, the Tenth Circuit has held that the independent source doctrine does not require "two discrete searches . . . —one lawful and one unlawful—before the exception will allow the admission of otherwise tainted evidence." *Id.* at

As the Fourth Amendment violation had no bearing on Agent Oper's decision to seek a second warrant or on the magistrate judge's decision to grant said warrant, the independent source exception to the exclusionary rule applies. Thus, the Court does not find it necessary to reach the issue of whether the inevitable discovery exception to the exclusionary rule applies as well.

## CONCLUSION

For the foregoing reasons, the Court finds that the evidence seized on December 13, 2017 from the second floor of Mr. Haack's apartment is admissible under the independent source exception to the exclusionary rule. Accordingly, the Court will not suppress that evidence.

**IT IS THEREFORE ORDERED** that Defendant's Opposed Motion to Suppress Evidence Seized as a Result of an Unlawful Search [Doc. 45] is **DENIED.**

Dated this 29th day of May 2024.

_____
MARTHA VÁZQUEZ
SENIOR UNITED STATES DISTRICT JUDGE

---

1279. "It is sufficient, for purposes of the independent source doctrine, if a lawful, genuinely independent source exists to provide a constitutional basis for the agents' disputed activities." *Id.* As established above, the government has met its burden to show that SA Oper's decision to seek the second warrant and the magistrate judge's decision to grant said warrant were not the result of the Fourth Amendment violation, and thus suppression is not warranted even under Tenth Circuit precedent. *Id.*