UNITED STATES DISTRICT COURT
DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

    Plaintiff,

vs.                                                                                   No. 18-CR-928 MV

ROBERT HAACK

    Defendant.

## MEMORANDUM OPINION AND ORDER

THIS MATTER is before the Court on Robert Haack's Motion to Reconsider Ruling Denying Defendant's Motion to Suppress. Doc. 147. The government filed a Response [Doc. 161] and Mr. Haack filed a Reply [Doc. 163]. Having considered the briefs and relevant law, and being otherwise fully informed, the Court finds that the motion is not well-taken and will be denied.

**I.  Background**

Mr. Haack is charged with two counts of wire fraud, in violation of 18 U.S.C. §1343, two counts of mail fraud, in violation of 18 U.S.C. § 1341, two counts of aggravated identity theft, in violation of 18 U.S.C. § 1028A(a)(1), and two counts of violating the Indian Arts and Crafts Act, in violation of 18 U.S.C. § 1158. Doc. 26.

In 2012, the U.S. Fish and Wildlife Service ("USFW") launched an investigation into the sale of purportedly counterfeit Charles Loloma jewelry. Doc. 45 at 1. The late Charles Loloma was a world-renowned jeweler and one of the most significant Native American artists of the twentieth century. Doc. 49 at 2; Doc. 45-1 at 14. His jewelry is highly collectible and typically sells for tens of thousands of dollars. Doc. 49 at 2; Doc. 45-1 at 14.

Based on complaints from within the jewelry community, USFW came to suspect that jewelry sold under the eBay username "Harvardantique" was counterfeit. Doc. 49 at 2. When

1

USFW determined that Mr. Haack operated the "Harvardantique" account, he became the subject of its criminal investigation. *Id.* On April 9, 2013, a USFW agent purchased a "Loloma" ring from Mr. Haack for $4,300. *Id.*; Doc. 45-1 at 15. On June 16, 2014, a USFW agent purchased a "Loloma" bracelet from Mr. Haack for $15,098. Doc. 49 at 2; Doc. 45-1 at 18. Forensic examiners, as well as Mr. Loloma's niece, examined the pieces and deemed them to be inauthentic. Doc. 49 at 1-2.

According to subpoenaed bank records, Mr. Haack sold approximately 41 pieces of purported Loloma jewelry on eBay from 2008 through 2015 for approximately $439,810.95. Doc. 45-1 at 19. After a customer complaint on eBay in 2015, Mr. Haack began selling purported Loloma jewelry directly to customers like "D.H.," who paid approximately $60,694 for purported Loloma jewelry between 2015 and 2017. *Id.* at 23. When questioned, Mr. Loloma's former business manager dismissed the possibility that Mr. Haack could have acquired such a significant collection of Loloma pieces. *Id.* at 16-17. USFW agents also obtained bank records showing that Mr. Haack had made significant purchases of raw materials consistent with jewelry making between 2008 and 2017. *Id.* at 25-27.

Based on this information, Special Agent Zachary J. Oper ("SA Oper") applied for a search warrant to search Mr. Haack's residence on December 7, 2017. Doc. 45-1 ("First Search Warrant Application"). SA Oper personally observed the residence and pulled financial and property records for the residence. Doc. 49 at 3. SA Oper reviewed a residential appraisal that indicated that the house was a two-unit building. *Id.* at 4; Doc. 49-3 ("Appraisal"). Upon reviewing a floorplan with no discernible internal stairway, SA Oper concluded that Mr. Haack's residence was confined to the first-floor unit of the two-story duplex. Doc. 49 at 4. Accordingly, SA Oper described the residence in relevant part as follows: "The RESIDENCE is the first floor unit of a two-unit, two-

story property." *Id.* at 3. The United States District Court for the Central District of California granted the First Search Warrant Application at 2:25 PM on December 7, 2017. Doc. 45-2 at 2 ("First Search Warrant"). The First Search Warrant contained an identical description of Mr. Haack's residence. *Id.* at 4.

Around 6:30 a.m. on December 13, 2017, USFW agents executed the First Search Warrant on Mr. Haack's home. Doc. 45 at 3; Doc 49-2; Transcript of May 24, 2024 Hearing ("Hr'g Tr.") 18:24-19:3.[1] The team executing the First Search Warrant consisted of nine agents. Hr'g Tr. 53:18-20. Six of the agents were based in New Mexico, two were based in Arizona, and one was based in Texas. *Id.* at 56:2-11. In order to enter the premises, agents cut a chain securing a gate across the driveway and proceeded down the driveway and around the corner, to the back of Mr. Haack's residence. *Id.* at 19:23-20:4. SA Oper knocked on the door at the back of the residence, later identified as the basement door, and announced the presence of police with a search warrant. *Id.* at 22:5-22. He continued to knock and announce for "thirty minutes, approximately." *Id.* at 22:15-16. Eventually, SA Oper made the decision to breach the door. *Id.* at 24:16-19. After breaching and entering the basement door, SA Oper quickly realized that this was not the first floor of the residence described in the plans on which he had based the First Search Warrant Application. *Id.* at 25:19-26:7. Upon realizing that the space they had entered was, in fact, a basement and not the first floor, SA Oper and his team exited and proceeded up an outdoor set of stairs to a door that faced into the kitchen of what the First Search Warrant described as the first floor of the residence. *Id.* at 26:10-27:8. Again, SA Oper knocked and announced the presence of police with a search warrant and breached the door to the first-floor kitchen. *Id.* at 27:13-21.

---

[1] The Court's citations to the transcript refer to the court reporter's original, unedited version; any final transcripts may contain slightly different page and/or line numbers.

3

Upon entry, it became apparent to USFW agents that there was an internal staircase leading to the second floor, which had not been reflected on the floor plans. Doc. 45 at 4; Doc. 49 at 5. One agent discovered Mr. Haack descending the stairs. Hr'g. Tr. 29:17-24. Agents performed a "protective sweep" of the second floor and discovered Mr. Haack's partner, Zenia Orbe, and their two children. *Id.* at 30:21-31:13. At that point, SA Oper was made aware that there was evidence relevant to the investigation in plain sight on the second floor. *Id.* at 32:3-18. Mistakenly believing that this discovery permitted agents to proceed with a more extensive search, SA Oper directed his team to begin searching the second floor and collecting evidence. *Id.* at 34:15-25. Notably, at some point in the morning, SA Oper showed Mr. Haack a copy of the First Search Warrant and Mr. Haack pointed out to him that it only authorized the search of the first floor. *Id.* at 34:11–19. SA Oper testified that he did not believe Mr. Haack was correct about the scope of the search, again citing his mistaken belief that the items in plain view authorized a more extensive search of the second floor. *Id.* at 34:17–19.

Later in the morning, roughly between 10:00 a.m. and 11:00 a.m., SA Oper called Assistant United States Attorney ("AUSA") Rykken after agents found suspected child pornography on the second floor of Mr. Haack's residence. Hr'g. Tr. 37:1-4, 37:14-19; 107:6-12. SA Oper testified that the illegal discovery of the suspected child pornography was the "trigger" that caused him to call AUSA Rykken. *Id.* at 107:10–15. After discussing the child pornography, AUSA Rykken asked SA Oper how the search was progressing. When SA Oper explained that the interior of Mr. Haack's home differed from its description in the First Search Warrant, AUSA Rykken advised him that he needed a search warrant to search the second floor. *Id.* at 36:18-37:4. On the advice of AUSA Rykken, who was based in California, SA Oper instructed his team to pause the search while he drafted a second search warrant application that included the second floor of the residence

4

and awaited approval from a local magistrate judge. *Id.* at 37:1-4, 37:14-19. At the hearing, he acknowledged that, by the time he paused the search and sought a warrant, his team was at the "middle to end" of the search of the second floor. *Id.* at 37:10-13. After speaking with the AUSA, SA Oper left the property to secure a new warrant. *Id.* at 37:24-38:1. He left in his truck, which at the time had no evidence from Mr. Haack's home inside of it. *Id.*

According to SA Oper's request for a second warrant, Mr. Haack's "children were on the second floor of the RESIDENCE, which USFW[] agents entered to conduct a safety search because the second floor and the first floor of the RESIDENCE are connected." Doc. 49-7 at 13 ("Second Search Warrant Application"). Once the safety search was completed, USFW agents "began searching the second floor, including digital devices found on the second floor, but stopped the search immediately after realizing that the second floor was not included in the December 7, 2017 search warrant." *Id.* at 14. The statement of probable cause in the second warrant application did not rely on anything that the agents found during their search of the second floor. Hr'g Tr. 42:21-23. Notably, this description omits the fact that SA Oper stopped the search only upon advice of an Assistant United States Attorney. *Id.* at 76:6-21. Furthermore, it is clear that some agents did not in fact follow this order, but instead continued to search and catalog evidence on the second floor in the hours that elapsed between the time that SA Oper gave instructions to stop searching and the time that he secured the second warrant. *Id.* at 76:22-25. The application does, however, make clear that agents had already begun to search the second floor. *Id.* at 42:24-43:7.

At 3:40 p.m., the United States District Court for the Central District of California granted a second search warrant to search Mr. Haack's residence. Doc. 45-3 at 2 ("Second Search Warrant"). The Second Search Warrant authorized USFW agents to search "the basement and first and second floor of the duplex." *Id.* at 4.

At 3:42 p.m., SA Oper sent a text message to USFW agents stating: "Good to search." Doc. 49-5 at 2. At that point, USFW agents completed their search and, once SA Oper returned to the scene shortly after 4:00 p.m., they began loading SA Oper's vehicle with seized evidence. Doc. 49 at 6; Hr'g Tr. 72:15-73:4. SA Oper testified that no evidence was removed from Mr. Haack's property until the Second Search Warrant was obtained and he returned in his truck. Hr'g Tr. 39:24-40:21. All evidence that had been seized was loaded into SA Oper's truck, which he then drove back to New Mexico. *Id.* at 44:25-45:7, 46:22-47:1. USFW agents seized various items including half-finished jewelry etched with the characteristic Loloma signature, engraving tools, bookmarked Loloma reference material, and jewelry-design sketches. Doc. 49 at 5.

Mr. Haack filed a Motion to Suppress Evidence Seized as a Result of an Unlawful Search [Doc. 45] and a Supplemental Brief in support of that Motion [Doc. 123]. Following a hearing on May 24, 2024, the Court denied the Motion. Doc. 144. The Court entered a Memorandum Opinion and Order on May 29, 2024, detailing the factual and legal basis for its decision. Doc. 143. Mr. Haack now asks the Court to reconsider its decision. Doc. 145.

## II.      Legal Standard

"Although the Federal Rules of Criminal Procedure do not authorize a motion for reconsideration, motions to reconsider in criminal prosecutions are proper." *United States v. Randall*, 666 F.3d 1238, 1241 (10th Cir. 2011) (citation and internal quotations omitted). In particular, "[a] district court should have the opportunity to correct alleged errors in its dispositions." *United States v. Christy,* 739 F.3d 534, 539 (10th Cir. 2014).

The Tenth Circuit has held that a motion to reconsider may be granted when the Court has misapprehended the facts, a party's position, or the law. *Servants of the Paraclete v. Does,* 204 F.3d 1005, 1012 (10th Cir. 2000). Specific situations where circumstances may warrant

reconsideration include "(1) an intervening change in the controlling law, (2) new evidence previously unavailable, and (3) the need to correct clear error or prevent manifest injustice. *Id.* However, "[a] motion to reconsider should not be used to revisit issues already addressed or advance arguments that could have been raised earlier." *Christy,* 739 F.3d at 539.

### III.     Analysis

In support of the instant Motion, Mr. Haack argues that "the Court has misapprehended the independent source doctrine and has disregarded key facts established at the suppression hearing that make application of that doctrine unwarranted." Doc. 147 at 2. Mr. Haack does not contest the Court's decision to apply the law of the Ninth Circuit. Accordingly, the sole question before the Court is whether it erred in its application of controlling Supreme Court and Ninth Circuit precedent regarding the independent source doctrine to the facts of this case. Specifically, the defense takes issue with the Court's treatment, or lack thereof, of the testimony elicited at the suppression hearing that revealed that SA Oper's motivation for calling AUSA Rykken in the first instance stemmed from illegally discovered suspected child pornography. Admittedly, the Court did not address this fact in its prior Memorandum Opinion and Order. However, the defense's arguments are ultimately unavailing, and the Court will not reconsider its decision to deny the initial suppression motion.

In *United States v. Saelee,* the Ninth Circuit held that "suppression is unwarranted, even where evidence was 'initially discovered during, or as a consequence of, an unlawful search,' when that evidence is 'later obtained independently, from activities untainted by the initial illegality.'" 51 F.4th 327, 355 (9th Cir. 2022) (quoting *Murray v. United States,* 487 U.S. 533, 537 (1988)). "To establish that evidence initially acquired unlawfully has later been independently obtained through an untainted source, the Government must show that no information gained from the

Fourth Amendment violations affected either [1] the law enforcement officers' decision to seek a warrant or [2] the magistrate's decision to grant it." *Id.*

The parties here agree that the initial search of the second floor was executed in violation of the Fourth Amendment. While the government continues to argue that it has met its burden of establishing both prongs of the independent source exception, the defense contends to the contrary that it was error for the Court to find that the violation did not affect SA Oper's decision to seek a warrant for the second floor. Specifically, the defense's motion details the chain of events that led to SA Oper securing the Second Search Warrant, noting that the illegal search of the second floor—and specifically, the discovery of suspected child pornography during that search—is what prompted SA Oper to contact AUSA Rykken. Doc. 147 at 5–7. The defense notes that, after SA Oper told AUSA Rykken that the First Search Warrant only authorized a search of the first floor of Mr. Haack's residence, AUSA Rykken "advised Agent Oper that he needed to obtain a second warrant authorizing him to search the second floor of Mr. Haack's residence." *Id.* at 6. According to the defense, this testimony establishes a causal link between the illegal search and the Second Search Warrant, positing that, "[w]ere it not for the illegal search and seizure of the flash drives, Agent Oper *never would have contacted* AUSA Rykken, and, thus, *never would have* obtained the second warrant." *Id.* at 7 (emphasis in original).

To be sure, SA Oper mistakenly believed that he had authority to search the second floor because certain items of evidentiary value had been seen in plain view during a protective sweep. It is also evident that, absent the phone call with AUSA Rykken, SA Oper likely would have continued to conduct the search of the second floor illegally. And it is equally evident that this phone call would not have occurred without the illegal discovery of suspected child pornography. As *Saelee* explains, *Murray* dictates that warrants sought after a constitutional violation must be

"obtained independently from *activities untainted* by the initial illegality." At first glance, it appears that the information gained from the phone call would qualify as "information *gained from the Fourth Amendment violation*[]," and that, under *Saelee*, the independent source doctrine would not apply.[2] However, the Court finds that this case turns not on the simple chain of causality, but rather on the following questions: What information prompted SA Oper to seek the warrant and was this the type of information that is relevant to the exclusionary rule and independent source doctrine?

Ultimately, to run afoul of the independent source doctrine, it is not enough that an agent relies on information obtained as a result of the illegal search; rather, there has to be some relation between the information obtained and the purpose of the warrant that is sought based on that information. An overview of the case law, including the cases cited by the defense, illuminates this requirement. For instance, in *Murray,* after receiving information that the defendants were potentially involved in illegal drug trafficking, law enforcement officers illegally entered the defendants' warehouse and observed some bales, which were later discovered to contain marijuana. 487 U.S. at 536. The *Murray* Court was careful to delineate that, in subsequently seeking a warrant for the warehouse, the officers did not rely on the relevant information gained by the unlawful search, namely the existence of the bales. *Id.* The existence of the bales was relevant because such information could have been indicative of drug trafficking and thus could

---

[2] Even if the information received from the phone call is, semantically, "information gained from the Fourth Amendment violation," it cannot be said that this information was "illegally obtained." *See U.S. v. Swope,* 542 F.3d 609, 616 (8th Cir. 2008) (noting that the information the defense alleged was used to obtain a warrant was potentially problematic because it was "illegally obtained" and therefore would have tainted the decision to seek a warrant). There is no question that the suspected child pornography was illegally obtained as it was the direct result of an overbroad warrantless search. It would be absurd, however, to categorize information received from a phone call to an AUSA (albeit prompted by the initial violation) as having been "illegally obtained."

9

have informed the agents' decision to seek a warrant to discover further evidence of drug trafficking. Similarly, in *Saelee,* the relevant information that could have prompted the decision to seek the warrant was photographs of items that added evidentiary value to the investigation at hand. 51 F.4th at 332. Other cases upon which the defense relies similarly elucidate that, in order to escape application of the independent source exception, the agent must have relied on illegally obtained evidence that has some relation to the investigation or to the purpose of the warrant. *See, e.g., United States v. Gigliotti,* 849 F. App'x 281, 286 (2d Cir. 2021) (the relevant information that defendants alleged was gained from the initial illegal search was the existence of a computer and a landline in the basement of the defendant's restaurant, which officers believed could be connected to illegal activity); *United States v. Baez,* 983 F.3d 1029, 1037 (8th Cir. 2020) (in investigation into drug trafficking activities, the relevant information gained from the initial illegal search consisted of two bags of methamphetamine); *United States v. Noriega,* 676 F.3d 1252, 1260–61 (11th Cir. 2012) (in investigation into marijuana trafficking offenses, evidence observed during initial illegal sweep was indicative of a marijuana growing operation); *United States v. Jadlowe,* 628 F.3d 1, 9–10 (1st Cir. 2010) (in investigation into drug trafficking, the relevant evidence gained from the initial illegal search consisted of two packages of cocaine).

      Here, the information upon which Agent Oper relied in deciding to seek the Second Search Warrant, namely AUSA Rykken's statement that he had exceeded the scope of the First Search Warrant is not information directly related either to the subject of the investigation into Mr. Haack's fraudulent sale of jewelry or to the purpose of the search warrant, namely, to find evidence of such fraudulent sale of jewelry. In other words, AUSA Rykken's statement is not information that incriminated Mr. Haack in any way relating to the underlying probable cause for the search warrant. *Cf. United States v. Kopankov,* 672 F. Supp. 862, 869 (N.D. Cal. 2023) (independent

source doctrine did not apply where the government relied on data extracted from a particular device pursuant to an expired initial search warrant to obtain a second search warrant for the same device). SA Oper was simply informed of the legal status of his search, which prompted him to course correct and seek a search warrant for the second floor.

The Court notes that, during his call with AUSA Ryyken, SA Oper did discuss incriminating information, namely, the discovery of suspected child pornography. But the discovery of the suspected child pornography is not the information upon which SA Oper relied in obtaining the Second Search Warrant. Indeed, if SA Oper had relied on the illegally obtained evidence of suspected child pornography to obtain a warrant to find *more* child pornography in Mr. Haack's home, then this would violate the first prong of *Saelee.* However, this was clearly not SA Oper's intent; he testified that he called AUSA Rykken about the child pornography for much the opposite reason, namely because it was not within the purview of the USFW to investigate such evidence. Hr'g Tr. at 36:14–17.

Instead, SA Oper relied upon AUSA Ryyken's advisement that, to search the second floor, he would need another warrant. This information was not illegally obtained, nor is it the sort of information that *Murray* or *Saelee* envisioned when counseling that the government must show that no information gained from a Fourth Amendment violation affected the agent's decision to seek a warrant. Accordingly, the defense has failed to show that the Court erred in finding that the government has met its burden of showing that both prongs of the *Saelee* test for application of the independent source doctrine are met, namely that no information gained from the Fourth Amendment violations affected either Agent Oper's decision to seek the Second Search Warrant or the magistrate's decision to grant it.

## CONCLUSION

In keeping with the Supreme Court's decision in *Murray* and the Ninth Circuit's decision in *Saelee,* the Court correctly found that no evidence from the illegal search prompted SA Oper to seek the search warrant. While the Court did not address the chain of events initiated by the discovery of the suspected child pornography, the information that SA Oper gained from his phone call with AUSA Ryyken about the legal status of his search, while causally connected to the Fourth Amendment violation, is not the type of information relevant to the independent source doctrine or the first prong of the *Saelee* test. Accordingly, the Court's analysis is unchanged, and no clear error has occurred warranting reconsideration. *Servants of the Paraclete,* 204 F.3d at 1012.

**IT IS THEREFORE ORDERED** that Mr. Haack's Motion to Reconsider Ruling Denying Defendant's Motion to Suppress [Doc. 147] is denied.

ENTERED this 18th day of June 2024.

_____
THE HONORABLE MARTHA VÁZQUEZ
SENIOR UNITED STATES DISTRICT JUDGE