IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

  Plaintiff,

vs.                                                                                                  No. 18-CR-928 MV

ROBERT HAACK,

  Defendant.

### MEMORANDUM OPINION AND ORDER

THIS MATTER is before the Court on Mr. Haack's Motion for Judgment of Acquittal Pursuant to Fed. R. Crim. P. 29. Doc. 222. The government filed a Response in opposition. Doc. 223. The Court heard argument on this matter on January 24, 2025. After hearing argument, considering the briefs and relevant law, and being otherwise fully informed, the Court granted the Motion. This Memorandum Opinion reiterates and explains the Court's findings.

### BACKGROUND

On March 28, 2018, Mr. Robert Haack was charged by Indictment with two counts of Wire Fraud, in violation of 18 U.S.C. § 1343, two counts of Mail Fraud, in violation of 18 U.S.C. § 1341, and two counts of a Violation of the Indian Arts and Crafts Act ("IACA"), in violation of 18 U.S.C. § 1159. Doc. 1. On April 9, 2019, a Superseding Indictment charged Mr. Haack with an additional two counts of Aggravated Identity Theft, in violation of 18 U.S.C. § 1028A(a)(1). Doc. 25. A trial on this matter was held from January 21, 2025 to January 24, 2025. On January 23, 2025, Mr. Haack filed the instant Motion for Judgment of Acquittal Pursuant to Fed. R. Crim. P. 29. Doc. 222. The government filed a Response on January 24, 2025. Doc. 223.

1

The following evidence was introduced in the government's case in chief. Charles Loloma was a prominent Hopi artist whose jewelry and other works of art are highly valuable and sought after. From 2008 to 2015, Mr. Haack sold 46 pieces of jewelry that he advertised as authentic Charles Loloma pieces. *See* Government's Exhibit 8. On April 4, 2013, Mr. Haack created an eBay listing to sell a "Charles Loloma Kachina Face Ring." *See* Government's Exhibit 10. He advertised that the ring had been acquired from Charles Loloma in Hotevilla in 1984 and that the ring was signed by Charles Loloma. *Id.* In an email to United States Fish and Wildlife ("USFW") Special Agent Russell Stanford ("SA Stanford"), who used the alias "Russell Payne" to purchase the ring, Mr. Haack wrote:

> This piece was purchased by my mother and father on of their may [sic] trips through Hopi in [sic] that began in the late 60's and continued until the early 90's. My father was the founder of International Metals Corporation (NYSE:IMCO) and traveled by car several times each year between his facilities in Tulsa, OK and Ventura, CA. It was on these trips that my family acquired the Native American collection of which Loloma is a part.

Government's Exhibit 11. On June 15, 2014, Mr. Haack created an eBay listing to sell a "Charles Loloma Modernist Katsina Face Bracelet." *See* Government's Exhibit 14. He advertised that the bracelet was acquired from Charles Loloma in 1981 and that it was signed by Charles Loloma. *Id.* As part of a task force aimed at investigating violations of the IACA, SA Stanford, as Russell Payne, purchased the ring and the bracelet from Mr. Haack. Trial Transcript Day 1 ("Trial Tr. I") at 168:1-3, 185:16-18, 192:22-25.[1] Both the ring and the bracelet were inscribed with a "Loloma" signature that appeared similar to the signature used on authentic Loloma jewelry. After purchasing the ring and the bracelet, SA Stanford asked Verma Nequatewa and Robert Rhodes to examine the pieces and determine if they were authentic Loloma jewelry. *Id.* at 198:11-15.

---

[1] The Court's citations to the transcript refer to the court reporter's original, unedited version; any final transcripts may contain slightly different page and/or line numbers.

Ms. Nequatewa testified that she was Mr. Loloma's niece and longtime apprentice. Trial Transcript Day 2 ("Trial Tr. II") at 26:5-7. She worked with her uncle in his studio in Hotevilla for over 20 years. *Id.* at 26:1-4. In describing her role at the studio, Ms. Nequatewa explained that the construction of Loloma pieces was collaborative—Mr. Loloma would make the metal frame and then she or someone else would work on the inlay of the jewelry. *Id.* at 35:9-15, 75:9-15, 73:13-78:10. Based on her experience working with her uncle and on her own jewelry, she was admitted as an expert in jewelry making and in Charles Loloma jewelry. *Id.* at 40:9-14. Ms. Nequatewa discussed in detail the process that Charles Loloma followed when making a piece of jewelry. *Id.* at 43:24-48:4. She also testified that Mr. Loloma signed his pieces with one tool that "looked like a large nail" and that he always used the same tool to sign his pieces. *Id.* at 38:1-11. She stated that she analyzed the ring and the bracelet that Mr. Haack sold to SA Stanford at the USFW lab and concluded that they were not authentic Loloma pieces. *Id.* at 52:1-66:21.[2]

Mr. Rhodes, who was Mr. Loloma's business manager from 1978 to 1980, testified that Mr. Loloma had a very close relationship with repeat customers. Trial Tr. II at 142:10-143:6. He also testified that he was not aware of any individual customer who had purchased more than 20 Loloma pieces. *Id.* at 143:13. With respect to the "Loloma" signature used on the jewelry pieces, he believed there were two different methods that Mr. Loloma used to create the "Loloma" inscriptions. *Id.* 153:10. One method was a with single tool that when struck would inscribe the whole name "Loloma." *Id.* at 153:10-12. This tool functioned like a stamp. *Id.* at 17-20. The other

---

[2] The government, on behalf of Ms. Nequatewa, asked for the portion of the transcript in which Ms. Nequatewa discussed the details of Mr. Loloma's work and her analysis of the authenticity of the ring and the bracelet to be redacted from the public record to prevent future counterfeiters from using this information. The Court granted this request. Thus, out of respect for Ms. Nequatewa's wishes, the Court will not detail every difference that she noted between the ring and the bracelet Mr. Haack sold and the authentic Loloma pieces, but notes that her testimony was credible, thorough, and detailed.

method utilized a single blade tool that would be used to create single strokes, which taken together could form the "Loloma" inscription. *Id.* at 13-16. Despite knowing about the existence of both methods, in his years of observing the work done at Mr. Loloma's studio, Mr. Rhodes only ever saw inscriptions formed with the stamp method tool. *Id.* at 154:1-3. Mr. Rhodes testified that he, as Mr. Loloma's business manager, was pleased that Mr. Loloma was inscribing the jewelry with his name because it indicated the pieces were from his studio. *Id.* at 154:4-9 (Q: "and you were – when you were a business manager pleased that he was putting these marks on the jewelry, right? A: Yes. Q: Because it told people that it came from his studio right? A: That's right.").

Both Mr. Rhodes and Ms. Nequatewa testified that Mr. Loloma had a legal signature that was different from his stylized inscription on jewelry. *Id.* at 154:11-15, 112:11-12. Mr. Rhodes testified that Mr. Loloma would sometimes sign invoices and that when he did so, he used his "regular signature" rather than the Loloma inscription. *Id.* at 16-19. Additionally, Mr. Rhodes testified that at some point during his life, Mr. Loloma "incorporated himself or his company as Loloma Inc." *Id.* at 154:24-155:2.

USFW Special Agent Tamara Kurey ("SA Kurey") testified that she executed a search warrant on Mr. Haack's home on December 13, 2017. Trial Transcript Day 3 ("Trial Tr. III") at 46:8-15. She testified that during the search, agents discovered "a lot of books about jewelry-making and Native American style jewelry and art. We found a lot of raw materials like turquoise and shell and other types of stone." *Id.* at 48:2-6. She also stated that they found tools used to shine gemstones, as well as "stamps" used to put a trademark or brand symbol on jewelry. *Id.* at 48:7-10. Agents also discovered ring sizers, a pendant with the Loloma signature stamped onto it, mold wax for jewelry making, and a Loloma reference book. *See* Government's Exhibits 23-41, 45-49.

**LEGAL STANDARD**

Under Rule 29 of the Federal Rules of Criminal Procedure, "[a]fter the government closes its evidence or after the close of all the evidence, the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29(a). Additionally, "[t]he court may on its own consider whether the evidence is insufficient to sustain a conviction." *Id.* Further, the court "may reserve decision on the motion, proceed with the trial (where the motion is made before the close of all the evidence)," and decide the motion at a later time, before or after the case goes to the jury, or even after the jury returns a guilty verdict. Fed. R. Crim. P. 29(b). Notably, "[i]f the court reserves decision, it must decide the motion on the basis of the evidence at the time the ruling was reserved." *Id.*

In reviewing a motion for a judgment of acquittal pursuant to Rule 29, the Court must determine whether, "viewing the evidence in the light most favorable to the government, any rational trier of fact could have found the defendant guilty of the crime beyond a reasonable doubt." *United States v. Vallo,* 238 F.3d 1242, 1247 (10th Cir. 2001) (quotation omitted). "The jury, as fact finder, has discretion to resolve all conflicting testimony, weigh the evidence, and draw inferences from the basic facts to the ultimate facts." *United States v. Valadez Gallegos,* 162 F.3d 1256, 1262 (10th Cir. 1998) (citation omitted).

**DISCUSSION**

On the instant motion, Mr. Haack argues that he is entitled to a Rule 29 judgment of acquittal on Counts 5 and 6 of the Superseding Indictment because, based on the government's evidence, no reasonable juror could find him guilty of Aggravated Identity Theft under 18 U.S.C. § 1028A. Section 1028A provides that, "whoever, during and in relation to any felony violation enumerated in subsection (c), knowingly transfers, possesses, or uses, without lawful authority, a means of identification of another person shall, in addition to the punishment provided for such

5

felony, be sentenced to a term of imprisonment of 2 years." Accordingly, to secure a conviction for Aggravated Identity Theft, the government must prove beyond a reasonable doubt that the defendant's conduct involved transferring, possessing, or using "the means of identification of another person." "The term 'means of identification' means any name or number that may be used, alone or in conjunction with any other information, to identify a specific individual." 18 U.S.C. § 1028(d)(7). Under Tenth Circuit precedent, a signature is a "means of identification" for purposes of § 1028A. *United States v. Porter*, 745 F.3d 1035, 1043 (10th Cir. 2014).

Mr. Haack contends that the "Loloma" mark on the jewelry that he sold to SA Stanford does not constitute "the means of identification of another person" because it was not used to identify Mr. Charles Loloma as a person, but rather was used to signal to customers that the source of the jewelry was the Loloma studio.[3] Accordingly, his argument continues, there is no evidence to prove that Mr. Haack knowingly possessed or used the means of identification of another person, as required by § 1028A. Doc. 222 at 3. As set forth herein, the Court agrees that the Loloma signature, as used in this case, does not constitute the "means of identification of another person" for the purposes of § 1028A, and thus that the government did not present evidence from which a reasonable juror could find that Mr. Haack knowingly transferred, possessed, or used the means of identification of another person. Consistent with this finding, at trial, the Court entered a judgment of acquittal on Counts 5 and 6 of the Superseding Indictment.

I.  **The Loloma Inscription on the Jewelry at Issue Identified the Source of the Jewelry (the Loloma Studio), Not an Actual Person (Charles Loloma).**

At first glance, Mr. Haack's conduct would seem to fall easily within the reach of the

---

[3] The Court notes that while Mr. Haack also argues that the Loloma signature was a registered trademark, the registration of the trademark is not in evidence. Instead, the Court's decision is based entirely on the evidence the government presented at trial.

6

Aggravated Identity Theft statute. The government introduced evidence that Mr. Haack created the ring and the bracelet at issue and inscribed them with a "Loloma" signature similar to the signature appearing on authentic Loloma jewelry. As noted above, a signature is considered a means of identification under § 1028A. *See Porter*, 745 F.3d at 1043. Further, a defendant is considered to "use" another person's means of identification "'in relation to' a predicate offense when this use is at the crux of what makes the conduct criminal." *Dubin v. United States,* 599 U.S. 110, 131 (2023). There is no doubt that the use of the Loloma signature was at the crux of the predicate crimes charged here, as the pieces would not have sold for as much money as they did if they had not carried that signature.

A more careful analysis yields a different conclusion, however, because, even viewing the evidence in the light most favorable to the government, the evidence did not establish that Mr. Haack used the Loloma signature as the means of identification of Charles Loloma *as an actual person*. Rather, the evidence adduced by the government established that Mr. Haack inscribed the ring and the bracelet with a signature like the one the Loloma studio used to signify the provenance of its jewelry, namely, the Loloma studio.

From the beginning of this case, the government's allegation has been that Mr. Haack fraudulently represented that the ring and the bracelet he sold to SA Stanford were created by Mr. Loloma and that Mr. Haack used the Loloma signature to make this false representation. The government's entire theory of the case, then, is that the Loloma signature was used not to identify an individual person (Charles Loloma), but rather to signal the source of the goods (the Loloma studio). *See* Government's Opening Statement, Trial Tr. I at 153:2-14 ("In 2012, a U.S. Fish and Wildlife agent began investigating Robert Haack for selling counterfeit Loloma jewelry and

7

defrauding his buyers . . . Haack listed both pieces as made by, signed by, and bought directly from Charles Loloma.").

Further, both Ms. Nequatewa and Mr. Rhodes testified that Mr. Loloma had a different legal signature that he used to sign financial and legal documents. In fact, Mr. Rhodes referred to that other signature as Mr. Loloma's "regular signature," indicating that unlike the Loloma inscription used on the jewelry, Charles Loloma, as an actual, individual person, used the other signature in his everyday affairs. Mr. Rhodes also testified that as Mr. Loloma's business manager, he was pleased that Mr. Loloma was using the stylized inscription at issue in this case to signal that the jewelry came from the Loloma studio. Thus, the government's own witnesses corroborated its theory of the case, namely, that the stylized Loloma inscription on jewelry produced in the Loloma studio was used to signal the source of that jewelry (the Loloma studio), and that Mr. Haack used a similar inscription to signal to potential buyers that the Loloma studio was the source of the pieces that he offered for sale. The government presented no evidence to the contrary.

Admittedly, the government's evidence established that the Loloma inscription was personally meaningful to Mr. Loloma. *See* Trial Tr. II at 67:12-14 (Ms. Nequatewa: "it's his jewelry so he has to sign it."). Accordingly, the government attempted to discredit Mr. Haack's argument by insisting that the pieces of jewelry at issue here were pieces of art, and therefore not "goods." Thus, the government argued, the Court should consider the personal importance that the signature had to Mr. Loloma. While the Court does not disagree that a piece of jewelry is as much a personally meaningful work of "art" as, for instance, a painting on canvas, the personal, meaningful nature of the jewelry does not remove it from the category of a "good." Nor does it change the fact that a signature thereon – just as a signature on a painting – identifies the *source* of that work of art (*i.e.,* by whom or where it was made). Furthermore, both Ms. Nequatewa and

Mr. Rhodes testified that multiple individuals worked on Loloma jewelry pieces collaboratively, indicating that the signature identified the good as coming from the Loloma studio. Notably, Mr. Rhodes testified that the Loloma inscription signified that the jewelry came from the Loloma studio. Furthermore, the government's argument is undermined by its own Superseding Indictment. In charging Mr. Haack with a violation of the IACA based on the same evidence underlying the Aggravated Identity Theft charges, the government specifically and repeatedly refers to the jewelry at issue here as "a good." Doc. 25 (stating that Mr. Haack knowingly displayed and offered for sale "*a good*, specifically: jewelry, in an manner that suggested that *the good* was Indian produced, an Indian product, and the product of a particular Indian and Indian tribe, resident within the United States, when in truth and in fact, as he there and then well knew and believed, *the good* was not Indian produced, an Indian product, and the product of a particular Indian and Indian tribe") (emphasis added).

Thus, the evidence before the jury established that Mr. Haack used a signature similar to that used to identify the source of authentic Loloma jewelry for the purpose of (mis)representing the source of the jewelry he sold to SA Stanford. As explained below, neither the language of § 1028A itself, nor the case law interpreting it, suggest that Congress intended Aggravated Identity theft to reach such use of a signature for the purpose of (mis)identifying the source of a good.

    II.    **Section 1028A Does Not Apply to Use of a Signature as a Means of Identification of the Source of a Particular Good.**

The Supreme Court has made clear that § 1028A applies only to the fraudulent use of the identification of another *actual person*. *United States v. Flores-Figueroa*, 556 U.S. 646 (2009). This clarification is consistent with the legislative history of § 1028A. *See Identity Theft Penalty Enhancement Act, and the Identity Theft Investigation and Prosecution Act of 2003: Hearing on H.R. 1731 and H.R. 3693 Before the Subcomm. on Crime, Terrorism, and Homeland Sec. of the*

9

*H. Comm. on the Judiciary,* 108th Cong., 2d Sess. 32 (2004) (statement of Rep. Schiff, Member, House Comm. on the Judiciary) ("these enhancements apply when the fraudulent identification is that of *another existing person*, either alive or deceased, but *an actual individual*.") (emphasis added). A jewelry studio is neither "another existing person" nor an "actual individual." It follows that a signature that identifies a good as coming from a particular jewelry studio is not the equivalent of the "means of identification of another person" for purposes of § 1028A.

This conclusion makes sense, given the Supreme Court's consistent directive to apply a "*narrow*[] reading" of § 1028A, centered around the *ordinary understanding* of identity theft." *Dubin*, 599 U.S. at 120 (emphasis added); *see also Flores-Figueroa,* 556 U.S. at 655. In particular, the Supreme Court has cautioned that "[i]nterpretation of § 1028A(a)(1) should [] reflect the 'distinction between' the aggravated identity theft crimes that Congress sought to distinguish for heightened punishment and other crimes." *Dubin*, 599 U.S. at 128. The Court is not convinced that the conduct at issue in this case, namely, the sale of counterfeit art that contains the forged signature of the artist, is one of the serious crimes that Congress intended § 1028A to target.

In *Flores-Figueroa,* the Court contrasted § 1028A, entitled "Aggravated Identity *Theft,*" with its neighboring provision, which does not contain the word *theft* but rather is simply entitled "Fraud and related activity in connection with identification documents, authentication, features, and information." 556 U.S. at 655. The Court found the inclusion of the word "theft" in the former but not the latter significant, noting that "the examples of theft that Congress gives in the legislative history [of § 1028A] all involve instances where the offender would know that what he has *taken* identifies a different *real person*." *Id.* at 656 (emphasis added). The *Dubin* Court similarly emphasized that:

> "[I]dentity theft" has a focused meaning. One dictionary defines identity theft as "the fraudulent appropriation and use of another person's identifying data or

> documents, as a credit card." Webster's Unabridged Dictionary xi (2d ed. 2001) (Webster's). Another similarly offers "[t]he unlawful taking and use of another person's identifying information for fraudulent purposes; specif[ically] a crime in which someone steals personal information about and belonging to another, such as a bank-account number or driver's-license number, and uses the information to deceive others." Black's Law Dictionary 894 (11th ed. 2019) (Black's) (defining "identity theft").

599 U.S. at 122. It is further relevant that the *Dubin* Court found particularly significant the fact that the title of § 1028A is not just "Identity Theft" but rather "*Aggravated* Identity Theft." *Id.* at 124. This title, the Court noted, "suggests that Congress had in mind *a particularly serious form* of identity theft." *Id.* (emphasis added).

A review of the Congressional record provides insight into what this "particularly serious form of identity theft" looks like. In the "Background and Need for Legislation" section of House Report No. 108-528, the record states that the two-year mandatory minimum was included in the legislation because, "[u]nder current law, many perpetrators of identity theft receive little or no prison time." H.R. Rep. No. 108–528, p. 25 (2004), U.S. Code Cong. & Admin. News 2004 at 781. The record goes on to list examples of cases where perpetrators of identity theft received what Congress determined to be excessively lenient sentences. The list included one defendant who used a skimmer to obtain credit-card data from at least 30 people and then proceeded to "provide[] stolen names, Social Security numbers, and credit-card information" to an individual involved in a plot to blow up the Los Angeles International Airport in 1999, and assist that individual in creating false green cards and Social Security cards. *Id.* at 783. Another defendant listed in the report "stole the identities of 24 people" and "submitted bogus Federal income tax returns for those people that sought average refunds of $50,000." *Id.* A third defendant obtained through his employment the Social Security number of another individual and used it at least five times to obtain loans and lines of credit, resulting in harm to the victim's credit rating and causing him to

11

struggle to clear delinquent accounts. *Id.* The cases and types of crimes that Congress chose to highlight bear no resemblance to the conduct at issue in this case, where Mr. Haack is accused of creating and selling counterfeit Loloma jewelry.

Additionally, in a general description of the need for the legislation, the House Report listed examples of identity theft provided by the Federal Trade Commission:

> For 2002, the FTC breakdown of types of identity theft shows that 42% of complaints involved credit card fraud, 22% involved the activation of a utility in the victim's name, 17% involved bank accounts opened in the victim's name, 9% involved employment fraud, 8% involved government documents or benefits fraud, 6% involved consumer loans or mortgages obtained in the victim's name, and 16% involved medical, bankruptcy, securities and other miscellaneous fraud.

*Id.* at 780. This list exemplifies what the Supreme Court called the "ordinary understanding" of identity theft. *Dubin,* 599 U.S. at 120. The use of an individual's signature to sell counterfeit art does not fall into any of these categories. Given the stark difference between the types of crimes contemplated by Congress when enacting the Aggravated Identity Theft statute and Mr. Haack's conduct, the Court cannot conclude that the sale of counterfeit art with forged signatures falls within the ambit of § 1028A.

Counter to the case law and legislative history, the government urges the Court to adopt a broad interpretation of § 1028A. Indeed, the government argues that not only does § 1028A reach the use of a forged signature to signal the source of a good, but also that is applicable where a defendant does no more than use an artist's name in an advertisement for a counterfeit good. *See* Doc. 223 at 8. Taking up the government's invitation, however, would expand § 1028A to encompass everyday counterfeiters who sell counterfeit goods with branded signatures of designers including but not limited to Louis Vuitton, Kate Spade, and Oscar de La Renta. This is exactly the type of interpretation the *Dubin* Court rejected.

In *Dubin,* the government asked the Court to interpret § 1028A to include overbilling offenses that only incidentally used other individuals' means of identification. The Supreme Court firmly rejected the government's invitation, noting that it would "turn the core of 'worse or more serious' identity theft into something that the ordinary user of the English language would not consider identity theft at all." 599 U.S. at 124. Similarly, to interpret the term "means of identification of another person" to include instances where a signature or name is used to advertise counterfeit goods or misrepresent their source would expand the scope of the Aggravated Identity Theft statute to offenses that look nothing like identity theft to the average person. Take for instance the defendant in *United States v. Kennedy,* 726 F.3d 968 (7th Cir. 2013), who was convicted of mail fraud and wire fraud after he was involved in a scheme to sell counterfeit fine art prints of well-known artists, including Salvador Dali, Marc Chagall, and Pablo Picasso. As part of this scheme, the defendant sometimes forged the artists' signatures and markings onto the paintings. Looking at the examples of identity theft in the Congressional record, it stretches the imagination to conclude that the ordinary user of the English language would understand that the *Kennedy* defendant "stole" Pablo Picasso's identity when he forged his signature. Instead, it would be more in line with common usage of the English language to conclude that he created a counterfeit good. The same reasoning applies with equal force here.

Notably, the *Dubin* opinion emphasized that a narrow interpretation of § 1028A is warranted to prevent prosecutorial overreach. In rejecting the government's broader interpretation of the statute, the Supreme Court reasoned that "if §1028A(a)(1) applies virtually automatically to a swath of predicate offenses, the prosecutor can hold the threat of charging an additional 2-year mandatory prison sentence over the head of any defendant who is going to trial." 599 U.S. at 131. The same concern would arise if this Court were to adopt the government's interpretation of §

1028A, as any defendant charged with mail or wire fraud for selling the counterfeit art of a particular artist, or counterfeit goods with branded signatures, could be threatened with a mandatory minimum prison sentence and thereby unduly coerced into accepting a plea agreement.

The existence of other statutory schemes aimed at the conduct at issue in this case also counsels in favor of a narrow interpretation of § 1028A. *See Flores-Figueroa,* 556 U.S. at 656 (concluding that the existence of a separate statutory scheme aimed at targeting "fraud and related activity in connection with identification documents, authentication features, and information" counseled in favor of a narrow interpretation of § 1028A, which was aimed at identity theft in particular). First, Mr. Haack's conduct is specifically targeted by the IACA, which criminalizes the act of representing that a good was made by a "particular Indian." *See* 18 U.S.C. § 1159. As noted above, the government charged Mr. Haack with a violation of the IACA, based on the very same conduct alleged to underly the § 1028A charge.

Additionally, 18 U.S.C. § 2320 prohibits the trafficking of counterfeit goods. This is essentially what Mr. Haack is accused of doing here (selling counterfeit Loloma jewelry). The government argues that the Court should not take this into account, as it would not be able to prosecute Mr. Haack under § 2320, which requires evidence of a registered trademark that is still in use, and there is no trademark currently in use in this case. Doc. 223 at 7. Whether under the specific facts of this case, the government would be able to secure a conviction under § 2320 is of no import—the fact remains that Congress created a separate statutory provision aimed at the conduct of which Mr. Haack is accused. The fact that the government might not be able to successfully prosecute Mr. Haack under § 2320 does not render § 1028A the appropriate statute under which to charge Mr. Haack for his conduct. Because Congress created § 1028A with the intent of addressing a rise in identity theft crimes not otherwise properly accounted for, the

14

existence of two separate parallel statutory schemes indicates that expansion of § 1028A to the conduct at issue in this case would be inappropriate.

In sum, as established by the Supreme Court in *Dubin* and *Flores-Figueroa,* the legislative history of § 1028A demonstrates that the purpose and scope of the statute is narrow and is intended to target crimes that fit within the ordinary understanding of the term "identity theft." Guided by this principle, the Court finds that interpreting the term "means of identification of another person" to include a signature used to fraudulently identify the source of a good would result in an improper expansion of § 1028A inconsistent with its narrow purpose and scope. Accordingly, the Court finds that where, as here, the signature of an individual is used to signal the source of a particular good, it is not the "means of identification of another person" for purposes of § 1028A.

## CONCLUSION

In granting Mr. Haack's Motion for a Judgment of Acquittal Pursuant to Rule 29, the Court finds that under 18 U.S.C. § 1028A, when a signature is used to identify the source of a good rather than to identify a specific individual, the signature does not fall within the definition of the "means of identification of another person" for purposes of § 1028A. Because the government's evidence established that the signature at issue in this case was used to identify the source of the jewelry as being from the Loloma studio, and did not establish that the signature was used to identify Charles Loloma, the actual individual, there was insufficient evidence for a rational trier of fact to find that Mr. Haack knowingly transferred, possessed, or used the means of identification of another person under § 1028A. Accordingly, the Court entered a judgment of acquittal on Counts 5 and 6 of the Superseding Indictment.

DATED this 24th day of February 2025.

_____
MARTHA VÁZQUEZ
Senior United States District Judge